## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHERN DIVISION

KC,                                          )
                                             )
                          Plaintiff,         )
          v.                                 )          No. 18-3045-CV-S-BP
                                             )
MARK MAYO, *et al.*,                         )
                                             )
                          Defendants.        )

## ORDER AND OPINION GRANTING
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff brought this suit asserting claims arising from harassment and sexual misconduct directed at her by a teacher, Johnna Feazell, when Plaintiff was a student in Junior High and High School in the Marshfield R-1 School District, ("the District.")  The remaining defendants in the case are:

- The District;

- Mark Mayo, the District's Superintendent during the relevant time period;

- Jeffrey Curley, Principal at the Junior High until July 2013, at which point he became the Principal at the High School; and

- Doug Summers, Assistant Principal at the Junior High until July 2013 (when Curley left to go to the High School), at which point he became the Principal at the Junior High.

Mayo has filed a Motion to for Summary Judgment.  (Doc. 102.)  The District, Curley, and Summers have filed a separate Motion for Summary Judgment.  (Doc. 100.)   For the following reasons, the motions are **GRANTED.**

# I.  BACKGROUND

Plaintiff has been permitted to proceed using a pseudonym, and the Court will refrain from identifying her or members of her family by name.  Similarly, other individuals in this case were (and may still be) minors at the time of these events; in an abundance of caution, the Court will refrain from naming these individuals (or anyone else who might permit them to be identified).

In Part A below, the Court will address the facts that are relevant under the legal standards applicable in this case.  In Part B, the Court will highlight some of the factual allegations that have been presented that, for one reason or another, cannot be considered or are not relevant under the governing law.  Some of these facts will also be mentioned in Part A.  Finally, Part C will set forth the case's procedural posture.  The Court will not provide citations for facts that have been agreed to by the parties.  Finally, additional facts (particularly the content of school policies) will be set forth in Part II of this Order.

## A.

As will be discussed in Part II, Defendants' knowledge is a critical element to Plaintiff's claims.  Generally, to be liable Defendants must have knowledge of a substantial risk that Feazell would harm Plaintiff.  In this Part I.A, the Court focuses on facts known to Defendants.

Plaintiff attended eighth grade at the Junior High during the 2012-13 school year.  Feazell was Plaintiff's English teacher and track coach that year and also coached Plaintiff's softball team (apparently, the high school team) the following summer (the summer before Plaintiff's freshman year of high school).  Before that time, Plaintiff's mother had allowed Plaintiff to have several out-of-school interactions with Feazell.  For instance, during the 2012-13 school year, Plaintiff's mother allowed Plaintiff to ride bikes with Feazell.  After the school year was over in May, Plaintiff's mother gave her permission to go to Feazell's classroom to help her before or after

softball practice. There was also an occasion that month when Plaintiff's mother let Plaintiff stay at Feazell's house while Plaintiff's mother went shopping in Springfield. Later in May of 2013, Plaintiff's mother allowed Plaintiff to go with Feazell to watch a softball game at the University of Missouri.

In June 2013 (after the trip to the University of Missouri), Plaintiff's mother found two letters Feazell wrote to Plaintiff.[1] The letters are not dated and there is no way to determine which was written first. In one, Feazell begins by mentioning a "nice surprise" on her computer, references the fact that she is in some "distress," and advises that "I thought to ease the time today, if I wrote something each time, I would feel better, so, be prepared and as usual, destroy!" (Doc. 119-1, p. 1.)[2] Feazell then states that Plaintiff has "changed me as a person tremendously" and that she

> can't think about how this year will end b/c I just don't want to lose this bond! I would honestly do anything for you just as if you were my daughter. (I don't know how many moms "take down" their daughters, but whatever!) When I say I love you to pieces it really is heartfelt. I feel the need to tell you as often as possible just b/c I want you to know at all moments, not just occasionally! It is said w/ genuiness [sic] each and every time!

(Doc. 119-1, pp. 1-2.) Feazell concludes the letter by thanking Plaintiff for being part of her life.

In the other letter, Feazell says that Plaintiff is the closest she will ever be to having a daughter, that she "open[ed] my heart and soul and boldly bare[d] it emotionally" and that Plaintiff

---

[1] There are some indications that Plaintiff's mother discovered the letters in April 2013; she initially testified that her discovery and subsequent conversation with Curley occurred in April 2013, and definitely before the end of the school year. (Doc. 119-30, pp. 2, 3 (Mother's Dep., pp. 27, 30).) In contradiction with this testimony, Plaintiff's mother also testified that her conversation with Curley occurred after the trip to the University of Missouri in May. (Doc. 119-30, p. 3 (Mother's Dep. at 30).) Later, she testified that her initial testimony could have been wrong and that her conversation with Curley may have occurred after the school year ended. (Doc. 119-30, p. 10 (Mother's Dep., pp. 117-18).) In their briefs the parties (including Plaintiff) repeatedly state that Plaintiff's mother brought the letters to Curley in June 2013, (*e.g.*, Doc. 109, pp. 6, 17, 21, 24), and the Court accepts the parties' resolution of this factual dispute.

[2] All page numbers are those generated by the Court's CM/ECF system and may not correspond to the document's pagination.

> [l]et me see a whole new side of love that . . . I didn't know existed!  I can't express how my heart feels to have this bond w/ you!  As I've said, I haven't, and never will again, have this w/ anyone!  You are the one and only daughter I will ever NEED!  You have completed me as a person, a mom, and have filled my soul w/ the utmost joy!

(Doc. 119-2.)  The letter closes with Feazell saying "I love you unconditionally, immensely, and w/ all of my heart!  Thank you, baby girl, for being my daughter."

Neither letter states that Feazell and Plaintiff were having a sexual relationship.  Plaintiff's mother testified that the letters depicted something other than a "normal professional adult-student relationship" but that she did not know that anything else was going on.  (Doc. 119-3, p. 4 (Mother's Dep., p. 33).)  She also testified that she told Curley that the notes "were highly inappropriate, they had crossed a line that no teacher should ever cross, and they were disgusting," and that she "didn't want them ever alone together, I didn't want her in her classroom, I didn't want them alone on the softball field."  (Doc. 119-30, p. 2 (Mother's Dep., p. 28).)  However, Plaintiff's mother did not testify that she thought the notes indicated that there was a physical relationship between Feazell and Plaintiff.  Plaintiff's mother wanted restrictions placed on Feazell's contacts with Plaintiff.  (*E.g.,* Doc. 119-24, pp. 11, 20 (Mayo Dep., pp. 78-79, 139).)  Curley testified that Plaintiff's mother was concerned "that Mrs. Feazell was overstepping her bounds, trying to – trying to be the mom."  (Doc. 119-25, p. 5 (Curley Dep., p. 37); *see also* Doc. 119-25, p. 4 (Curley Dep., p. 29).)  Curley and Mayo interpreted the letters similarly, (*e.g.,* Doc. 101-14, p. 3 (Curley Dep., p. 133); Doc. 103-3, p. 8 (Mayo Dep., p. 75)), or as reflective of a "mentor/mentee" relationship arising from Feazell's concerns about Plaintiff's home life.  (*E.g.,* Doc. 119-24, p. 19 (Mayo Dep., pp. 130-33).)  There is no evidence that anyone – including Plaintiff's mother – thought that the letters suggested a romantic or physical relationship existed.

Approximately two weeks later,[3] Plaintiff's mother returned to the school and talked to Curley. She showed him Plaintiff's phone, which had numerous text messages from Feazell. Plaintiff's mother complained that this was "completely across the line" and that the police needed be called, but Curley talked her out of doing so. (Doc. 119-30, pp. 5-6 (Mother's Dep., pp. 38-41).) The text messages are not in the Record and apparently do not exist; Plaintiff's mother testified that she no longer has the phone. (Doc. 119-30, p. 5 (Mother's Dep., p. 40).) However, nothing in the Record indicates that the texts demonstrated any sexual activity. In her briefing Plaintiff describes the texts as "harassing" and "more troubling in tone and content than" the letters, but Plaintiff's mother did not say that they described a physical/sexual relationship, instead explaining that the texts reflected Feazell's increasing anxiety over Plaintiff's failure to return her calls. (Doc. 109, pp. 40-41; Doc. 119-34, ¶¶ 6-7.) For his part, Curley testified that the texts were not similar in tone to the letters, were "general" and about softball, and the content was not alarming – but they did confirm that Feazell had been texting with Plaintiff. (Doc. 119-25, pp. 6-7 (Curley Dep., pp. 57-58).) As stated, the texts are not in the Record, and there is no competent evidence as to their contents.[4]

On June 17, Curley, Feazell and a representative from the teacher's union met to discuss Plaintiff's mother's complaint, and a memo memorializing the meeting was written on June 18. The memo reflects that during the meeting Feazell provided additional communications between herself and (1) Plaintiff and (2) Plaintiff's parents. In addition, at some point Plaintiff provided Curley with "a letter describing her relationship with her mother, the dynamics of her home life

---

[3] *See* footnote 5, *infra*.

[4] At some point, Curley and Mayo discussed Plaintiff's mother's complaints. (Doc. 119-25, p. 11 (Curley Dep., pp. 107-09); Doc. 119-24, p. 9 (Mayo Dep. pp. 72-73).) Summers, then the assistant principal at the Junior High, joined the conversation between Curley and Mayo. (Doc. 119-24, p. 11 (Mayo Dep. p. 78).)

and her positive relationship with Miss Feazell." (Doc. 101-14, p. 4.) The memo makes the following directives to Feazell:

- Stop texting and writing letters to Plaintiff

- Only talk to Plaintiff about school-related issues

- If a need to discuss personal issues arose, then another adult must be present

- Curley or Summers are to be advised if there are any conversations unrelated to education or school

(Doc. 101-14, p. 4.)[5]

Shortly after the next school year started (likely around September 11, 2013), a teacher at an elementary school in the District, (MM), was arranging for a sleepover at her house for her daughter and Plaintiff; MM's daughter and Plaintiff were in the same grade. Feazell contacted MM shortly after the arrangements were made, explained that she had learned about the plans, and "asked . . . if she could come by and pick [Plaintiff] up and hang out for a while." (Doc. 119-31, p. 6 (MM Dep., pp. 47-48).) According to MM, Feazell "said that she's just trying to help [Plaintiff], that she had a rough home life and she was just worried about her and wanted to come

---

[5] In her Suggestions in Opposition, Plaintiff has argued that her mother provided the texts from Plaintiff's phone after Curley directed Feazell to stop texting Plaintiff, (e.g., Doc. 109, pp. 10, 40), demonstrating that Feazell did not follow Curley's instructions. The Court does not describe the facts in this manner because it is not supported by evidence in the Record. Curley's testimony indicates that Plaintiff's mother provided the letters and the texts in the same visit. (E.g., Doc. 119-25, p. 6 (Curley Dep., pp. 54-55).) Plaintiff's mother avers that she reported the texts to Curley in a subsequent meeting. (E.g., Doc. 119-34, ¶ 3.) However, even if the Court construes the facts in Plaintiff's favor and accepts (based on her mother's sworn statements) that her mother had two separate conversations with Curley, Plaintiff identifies nothing in the Record that places the events in the order that she describes in her briefing. The only evidence in the Record regarding the timing of these events is from Curley, who testified that (1) Plaintiff's mother supplied the text messages before he met with Feazell, and (2) neither of Plaintiff's parents made any complaints about Feazell texting after he met with Feazell in June 2013. (Doc. 119-25, pp. 6, 13 (Curley Dep., pp. 54-57, 152-53); see also Doc. 119-24, p. 26 (Mayo Dep., p. 186).) Moreover, Curley's memo to Feazell clearly references that Curley had both letters and texts from Feazell that were supplied by Plaintiff's mother (which is consistent with the memo's directive telling Feazell to stop texting Plaintiff), thereby establishing at best that (1) Plaintiff's mother brought the letters to Curley, (2) after that, Plaintiff's mother brought the text messages to Curley, and (3) after that, Curley met with Feazell and issued the memo. Thus, the undisputed facts in the Record establish that Plaintiff's mother showed Curley the texts before he talked to Feazell, and those texts from Feazell did not violate Curley's "no texting" edict.

get her and do something nice for her. And then she explained that she was fixing up a bedroom for her and wanted her to pick out paint colors." (Doc. 119-31, p. 6 (MM Dep., p. 48).) Feazell also "claimed that [Plaintiff's] home life was horrible" because she "was being verbally and emotionally abused" but "there wasn't any way to prove it" and "she just wanted to do something nice for her." (Doc. 119-31, p. 7 (MM Dep., pp. 49, 50).) Upon learning that Feazell did not have Plaintiff's parents' permission, MM told Feazell that she could not pick up Plaintiff. MM then reported this incident to a counselor, who advised her to talk to her principal at the elementary school, Michelle Mitchell. Mitchell suggested that MM talk to Summers – who by this time was the principal at the Junior High. MM told Summers about her conversations with Feazell and showed him the text messages that Feazell had sent, and Summers asked for permission to show the messages to Mayo. (Doc. 119-31, p. 15 (MM Dep., pp. 129-30).) At some point, MM also related these events to Curley (who by now was the principal at the High School). (Doc. 119-31, pp. 9, 16 (MM Dep., pp. 57, 133-34).)[6] Summers contacted Feazell, who initially denied contacting MM, but then explained that she just wanted to make sure that Plaintiff was alright and to "see how she was doing." (Doc. 119-27, p. 4 (Summers Dep., pp. 66-67).)

On October 9, 2013, Mayo wrote a Notice of Deficiency to Feazell, ("the Notice"). (Doc. 119-5.) One of the topics in the Notice relates to Feazell's continued communications with Plaintiff, including attempts to communicate with Plaintiff through another teacher, (MM), and acknowledges Feazell's representations that she was communicating with Plaintiff because she

---

[6] At an unstated point in time, MM also told Curley about reports from her daughter that Feazell and Plaintiff were communicating with each other via phone. (Doc. 119-31, p. 16 (MM Dep., pp. 135-36).) However, MM's daughter told MM about these communications during her and Plaintiff's eighth grade year, (Doc. 119-31, p. 4 (MM Dep., pp. 29-30)), so they occurred before Plaintiff's mother brought the letters and texts to Curley's attention (and, hence, before Curley's June 2013 directive). Thus, these communications did not violate Curley's instructions. In addition, MM's daughter did not indicate that any of the communications between Feazell and Plaintiff were sexual or harassing. (Doc. 119-31, p. 4 (MM Dep., p. 31).)

was concerned about her welfare at home.  (*See* Doc. 119-24, p. 30 (Mayo Dep., p. 229).)  The Notice stated that:

> If the student has issues with parents and/or guardians they should be instructed to contact guidance counselors, DFS, or local law enforcement.  If you feel that the student is the subject of abuse and neglect you should also contact the Missouri Child Abuse and Neglect hotline.  The student SHOULD NOT be advised not to obey the lawful directives of their parents/guardians.
>
> &ast;   &ast;   &ast;
>
> [I]f you have reason to believe that [Plaintiff] is the subject of abuse and/or neglect by her parents, then you, as a mandatory reporter MUST contact DFS to make the hotline reports. . . . Please also know that if you truly feel that [Plaintiff] has been the subject of abuse and neglect we want you to please feel free to contact a counselor or any administrator and we will aid you in filing that report.  If, however, there is no . . . evidence that would warrant an investigation, then you are directed to stay away from [Plaintiff] except to provide (1) instruction on academic matters; and/or, (2) coaching and instructional aid and support for participation in extra-curricular activities wherein you are an assigned coach, sponsor, or supervisor of activities.

(Doc. 119-5.)  The Notice also placed Feazell on probation for four months and warned that further violations would result in further disciplinary action (possibly including termination).  (Doc. 119-5; Doc. 103-3, p. 22 (Mayo Dep. p. 226).)

Feazell's personnel file included three letters, apparently written by Feazell and provided to students other than Plaintiff.  None of them are dated, and there is no information about when they were put in her personnel file, or why; in fact, there is no other information about them whatsoever.  All three letters suggest a greater degree of familiarity between the teacher and the student-recipient than would normally be expected.  In one, Feazell asks the recipient for her softball schedule, and then says: "We can travel during the summer and the boys will love it! Who knows, I might be able to practice my tongue thing on a real person!"  (Doc. 119-47.)  The tone of

the other two notes are, as stated, not particularly professional, but in terms of content are relatively benign. (Doc. 119-48; Doc. 119-49.)[7]

Unbeknownst to anyone (including Defendants and Plaintiff's mother) Feazell bought Plaintiff a phone so that they could continue texting each other. Plaintiff's mother found this phone in October 2014 and brought it to Curley. The Record does not reflect what these texts said, but it is clear that they evidenced sexual activity between Feazell and Plaintiff. Curley contacted the police, and then contacted Mayo. Feazell was immediately placed on administrative leave and escorted from the premises. She resigned while she was suspended. Later, she pleaded guilty to various felonies arising from her contact with Plaintiff, including statutory sodomy and sexual contact with a student.

These are the only complaints regarding Feazell in the District's records for the relevant time period. (Doc. 119-26, pp. 10, 16 (Steward Dep., pp. 71-73, 215-16).) None of the Individual Defendants testified to knowing anything more than what is reflected above, and any evidence regarding other employees' knowledge similarly reflects that nobody else knew about sexual (or sexually harassing) conduct Feazell directed at Plaintiff (or anyone).

**B.**

Plaintiff's oppositions to the two motions presents a multitude of facts that are not relevant under the law governing her claims or are otherwise of no probative value.[8]  In some instances,

---

[7] Defendants argue that these notes should be disregarded because none of them are authenticated: it is not established that Feazell wrote them, when they were written, or who they were sent to, and there is no indication that any of the Defendants knew about them. In addition, the Court has not been referred to any part of the Record where the Individual Defendants were asked about them. However, they were in Feazell's personnel file, presumably were put there when she was still an employee, and are part of the District's records. (*See* Doc. 119-26, p. 18 (Steward Dep., pp. 263-64).) Thus, Plaintiff is entitled to an inference that Feazell wrote them, that they were in Feazell's file before Feazell resigned, that their contents were "known" by the District, and that Defendants would have been aware of the contents of Feazell's personnel file when they were addressing Feazell's interactions with Plaintiff.

[8] In many instances there is no evidence to contradict Defendants' sworn statements that they were not aware of many of these facts. However, even if there is a factual dispute, as will be described it is unlikely that the ultimate outcome

the asserted facts also are not supported by competent evidence and thus cannot be considered (particularly because Plaintiff has not attempted to demonstrate that the evidence can be presented in admissible form). *E.g., Smith v. Kilgore,* 926 F.3d 479, 485 (8th Cir. 2019); *Gannon Int'l, Ltd. v. Blocker,* 684 F.3d 785, 793 (8th Cir. 2012). Space and time do not permit the Court to address all these facts, but those that are particularly stressed by Plaintiff are addressed below:

1.      MM's daughter told MM about a sleepover at another classmate's house that was attended by both her and Plaintiff. Feazell came to the house and brought candy. (Doc. 119-31, p. 4 (MM Dep., p. 31).) However, there is no evidence that MM told school administrators about this incident. (*See* Doc. 119-31, pp. 5-6, 12 (MM Dep., pp. 41, 44-45, 106-07).) In addition, MM does not recall when this incident occurred or when her daughter told her about it. (Doc. 119-31, pp. 4, 5 (MM Dep., pp. 32, 44).)

2.      After MM reported Feazell's requests to pick up Plaintiff from her house, Feazell came to MM's classroom to discuss the matter. Feazell was upset that MM had made the report to school administrators and expressed concern about possible job consequences for her and that "this was consuming her." (Doc. 119-31, pp. 9, 17 (MM Dep., pp. 59, 139).) It also appeared to MM that Feazell "didn't look good." (Doc. 119-31, p. 17 (MM Dep., p. 139).) However, MM does not recall relating this to any administrators, including Defendants, although she did ask Mitchell not to allow Feazell to come to her classroom in the future. (Doc. 119-31, p. 10 (MM Dep., pp. 61-62).) Mayo denied having knowledge of this incident. (Doc. 119-24, p. 8 (Mayo Dep. p. 64).) It does not appear that the others were asked about it during their depositions – but, as stated, MM testified that she did not recall telling any of them.

---

would be different because many of these facts (even if known) would not have given Defendants knowledge that there was a substantial risk that Feazell would violate Plaintiff's rights.

3.  At some point while discussing the sleepover in the Fall of 2013, Feazell indicated to MM that she wanted Plaintiff to live with her, (Doc. 119-31, p. 14 (MM Dep., pp. 126-27)), but there is no competent evidence that MM told anyone this.  In addition, in contrast to Plaintiff's characterizations, MM did not tell Defendants that Feazell asked to let Plaintiff stay overnight at her house, (*see, e.g.,* Doc. 119-31, pp. 6-7, 9, 11 (MM Dep., pp. 48-49, 57-58, 65)), and the individual Defendants testified that they had no information to that effect.  (*E.g.,* Doc. 119-24, pp. 6, 27 (Mayo Dep., pp. 54, 194, 197); Doc. 119-27, p. 3 (Summers Dep., pp. 44-45).)  Plaintiff points to a police report indicating that Curley told a detective that he knew Feazell intended for Plaintiff to spend the night with her, (Doc. 119-8, p. 2), but (consistent with MM's testimony), Curley testified that MM did not convey that information to him, that he did not make the statement to the detective, and he did not adopt the detective's report as his statement.  (Doc. 119-25, p. 14 (Curley Dep., pp. 171-73).)  Plaintiff suggests that the detective's report can be admitted as substantive evidence to establish Curley's knowledge, (Doc. 114, p. 27 n.2), but Plaintiff does not explain why this is so and the Court is not persuaded.  While Curley's statements are not hearsay, Fed. R. Evid. 801(d)(2)(A), the police report is hearsay and cannot be used to establish Curley's knowledge.  *E.g., Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 321-22 (2009) (explaining why police reports do not qualify as business records or public records under the Federal Rules of Evidence); *United States v. Taylor,* 462 F.3d 1023, 1026 (8th Cir. 2006).[9]

4.  According to the District's corporate representative, (David Steward), at an unspecified point in time, Mitchell was at Silver Dollar City and saw several students there.  She also saw "kind of across the crowd . . .  [Plaintiff] and Feazell both [there] at the same time," although she

---

[9] Even if it is admissible, the police report would be admissible only as to Curley and the District; it could not be admissible as to Summers or Mayo because Curley's out of court statements would constitute hearsay with respect to them.

could not tell if they were there together or as part of a larger group. (Doc. 119-26, pp. 4-5 (Steward Dep., pp. 25, 27).) Mitchell related this to Mayo when she saw him at a football game soon thereafter. Football season runs from August until November at the latest, but there is no indication as to (1) when Mitchell saw Plaintiff and Feazell at Silver Dollar City or (2) when Mitchell told Mayo. (*See* Doc. 119-26, pp. 4-5 (Steward Dep., pp. 23-27).) There is also no indication that Mitchell saw anything untoward (much less that she told Mayo anything other than the fact that Feazell and Plaintiff were at Silver Dollar City).[10]

5.    According to Plaintiff, Feazell sent her a card and candy on Valentine's Day. However, there is no indication what year this occurred, that it occurred at the school, or that any of the Defendants knew that this happened. (Doc. 119-32, ¶ 14.)

6.    In the Fall of 2014, Feazell sent a bouquet of flowers and chocolates to the high school as birthday presents for Plaintiff. However, there is no admissible evidence that Defendants knew that (1) Plaintiff received flowers and chocolates or (2) that they came from Feazell. Plaintiff's interrogatory answer states that Feazell texted her that "Curley and the secretary read the card attached to the flowers and knew who they came from" and that "Curley had called her about the flowers." (Doc. 119-32, ¶ 19, pp. 17-18.) However, Feazell's out of court statements constitute hearsay and cannot be considered, and the Court has not been directed to any competent evidence establishing that Defendants knew that flowers and chocolates had been brought to the office for

---

[10] Defendants contend that this testimony constitutes hearsay, and the Court agrees – except insofar as the District is concerned. Steward was the District's corporate representative, so anything he said would be a statement of the District and thus does not constitute hearsay. Fed. R. Evid. 801(d)(2)(A). Mitchell's statements to Steward may also constitute the District's statement pursuant to Rule 801(d)(2)(D) because she made the statement to Steward during and in the scope of her employment with the District. However, Mitchell was not anyone else's agent, and Mitchell was not deposed (or, at least, her deposition testimony on this issue has not been provided to the Court). Thus, while Mitchell's out of court statements are not admissible against Curley, Summers or Mayo, they may be admissible against the District. Nonetheless, as explained, the lack of any evidence establishing when these events occurred or exactly what Mitchell said deprives this evidence of any probative value.

delivery to Plaintiff, much less that any of them looked at the card or otherwise knew that the flowers and chocolates came from Feazell.

7.      Plaintiff references a complaint that Feazell had girls in the class pole dance for her. However, the Record does not support Plaintiff's description of this incident.  First, Plaintiff cites pages 54 and 55 of Mayo's deposition, but the incident is not mentioned on those pages.  (Doc. 119-24, p. 6 (Mayo Dep., pp. 54-55).)  In October 2014 – after Feazell left – a parent sent "Dr. Theobald" an email complaining about a different incident involving Feazell.  In the course of making *that* complaint, the parent wrote: "as I understand it, [Feazell] has also been reprimanded several years ago when Alan Thomas was the principal of the junior high for having students pole dance in her classroom and use adjectives to describe this."  (Doc. 119-21, p. 2.)  There is no admissible evidence that such an event actually occurred, there is no admissible evidence that a complaint about pole dancing was actually made, and there is no admissible evidence that any of the Individual Defendants knew about it before Feazell was arrested.[11]  To the contrary, Mayo testified that he learned of it when the October 2014 email sent to Dr. Theobald was forwarded to him, but he did not investigate it further because he had already reported Feazell to the authorities and she was no longer at the school.  (Doc. 119, pp. 6-7, 37-38 (Mayo Dep. pp. 57-59, 289-90).)  And Curley (who succeeded Thomas as principal of the Junior High) denied any knowledge of such an incident.  (Doc. 119-25, p. 5 (Curley Dep., p. 35).)

8.      Plaintiff testified that at track meets Feazell would rub her leg under the guise of administering medical treatment and tackle her and "take [her] down" on the field, and that Curley was at some of the track meets supporting the school.  However, Plaintiff does not know if Curley

---

[11] Plaintiff makes much of the fact that the District's records do not contain a complaint about the pole dancing incident.  However, there is no competent evidence that such a complaint was made – the parent's email only states that she "understand[s]" that a complaint was made and does not reflect her personal knowledge.  Thus, Plaintiff's repeated reference to the "missing" record is of no consequence.

saw this happening, and there is no evidence that he did. (Doc. 101-17, pp. 3-5 (Plaintiff's Dep., pp. 99-100, 120-21), Doc. 119-32, p. 12.)

9.      Feazell molested/assaulted Plaintiff at various locations during the 2013-14 school year. However, there is no evidence that Defendants knew about them before Feazell was arrested. (*See* Doc. 119-28, pp. 4-5 (Plaintiff's Dep., pp. 144-145); Doc. 101-18, p. 3 (Plaintiff's Dep., p. 149); Doc. 119-32, pp. 14-19.)

10.     Plaintiff contends that "Feazell first volunteered to coach softball after she learned [Plaintiff] was going to be on the team." (Doc. 109, p. 32, ¶ 54; Doc. 110, p. 40, ¶ 15.) However, the citation to the Record supplied by Plaintiff – page 113 of Plaintiff's mother's deposition – does not address when or why Feazell became the softball coach. (Doc. 119-30, p. 9 (Plaintiff's Mother's Dep., p 113).) And, to the extent that it matters, Feazell had prior experience with softball, (*e.g.,* Doc. 119-25, p. 5 (Curley Dep., p. 34)), so the fact that she sought to coach the softball team would not have been alarming.

11.     In her argument, Plaintiff references an incident that occurred on a bus, when Plaintiff and Feazell were under a blanket. (Doc. 109, p. 44.) The Court has not been directed to any evidence about such an incident, much less any evidence establishing that Defendants knew about it.

### **C.**

The Complaint contains five counts:

- Count I alleges that the Individual Defendants were negligent.

- Count II asserts a claim against the District under Title IX of the Education Amendments of 1972.

- Count III is based on 42 U.S.C. § 1983, and asserts that the Individual Defendants violated Plaintiff's equal protection rights.

- Count IV is an alternative claim under 42 U.S.C. § 1983, asserting that the Individual Defendants violated Plaintiff's due process rights.

- Count V is a claim under 42 U.S.C. § 1983 and *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging that the District is liable for the Individual Defendants' violations of Plaintiff's constitutional rights as asserted in Counts III and IV.

In an Order dated May 7, 2018, the Court dismissed Count I based on official immunity and denied Defendants' motion to dismiss the other claims. (Doc. 31.)[12] The Court later granted Plaintiff's Motion for Reconsideration and reinstated Count I in part, concluding that "at least one policy identified by Plaintiff [to support the negligence claim] might impose ministerial duties" in which case official immunity would not be available. (Doc. 45, p. 5.)

## II. DISCUSSION

A moving party is entitled to summary judgment on a claim only upon a showing that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). However, not all undisputed facts will justify summary judgment; as Rule 56(a) suggests, only undisputed *material* facts can do so. "[T]he materiality determination rests on the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Conversely, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted).

---

[12] The Order also dismissed claims asserted against Keith White and Kevin Armstrong because the Complaint did not allege anything about their knowledge or actions regarding these events.

In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be *reasonably* drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985). "The nonmoving party is entitled to all reasonable inferences that may be drawn from the evidence but not to inferences that may only be drawn by resorting to speculation." *Williams v. City of Carl Junction, MO,* 480 F.3d 871, 873 (8th Cir. 2007) (cleaned up); *see also Hill v. Southwestern Energy Co.,* 858 F.3d 481, 487 (8th Cir. 2017).

Finally, a party opposing a motion for summary judgment may not simply deny the allegations but must point to evidence in the Record demonstrating the existence of a factual dispute. Fed. R. Civ. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909-10 (8th Cir. 2010). A motion for summary judgment "may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment" is satisfied. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). And significantly (given the issues and arguments in this case) the moving party can make this showing by demonstrating the respondent's inability to prove facts necessary to support her claim. *Id.* at 322-23. "[T]he burden on the moving party may be discharged by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325; *see also St. Jude Med., Inc. v. Lifecare Int'l, Inc.,* 250 F.3d 587, 596 (8th Cir. 2001). The moving party still "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the Record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.,* 477 U.S. at 323. But, "[i]t is enough for the movant to bring up the fact that the record does not contain [evidence to support the] issue and to identify

that part of the record which bears out this assertion.  Once this is done, [the moving party's] burden is discharged, and, if the record in facts bears out the claim that no genuine dispute exists . . . it is then the respondent's burden to set forth affirmative evidence, specific facts, showing that there is a genuine dispute on that issue."  *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.,* 838 F.2d 268, 273-74 (8th Cir. 1988).  "It is well-established that when a movant for summary judgment points out to the court an absence of evidence to support an essential element for which the nonmovant will have the burden of proof at trial, the nonmovant must make a sufficient showing that there is a genuine issue of fact as to that element."  *Barnwell v. Watson,* 880 F.3d 998, 1005 (8th Cir. 2018); *see also Bedford v. Doe,* 880 F.3d 993, 996-97 (8th Cir. 2018).  Thus, for instance, if a Defendant testifies that he does not know a particular fact, and if the Defendant's knowledge of that fact is material to Plaintiff's claim, the Plaintiff must respond by identifying evidence in the Record that creates a reasonable inference that the Defendant knew that particular fact.

### A.  Count I – Negligence

Count I alleges that the Individual Defendants were negligent in failing to take greater steps to protect Plaintiff from Feazell's conduct and in failing to make a report to the authorities. Defendants argue that they are entitled to official immunity under state law because Plaintiff alleges that they failed to perform discretionary duties.  Plaintiff argues that official immunity is not available because she has described violations of Defendants' ministerial duties.  As discussed below, the Court agrees with Defendants.

"Under Missouri law, official immunity 'protects public employees from liability for alleged acts of negligence committed during the course of their official duties for the performance of discretionary acts.'"  *K.B. v. Waddle*, 764 F.3d 821, 824 (8th Cir. 2014) (quoting *Southers v.*

*City of Farmington,* 263 S.W.3d 603, 610 (Mo. 2008) (en banc)). "The determination of whether an act is discretionary or ministerial is made on a case-by-case basis, considering: (1) the nature of the public employee's duties; (2) the extent to which the act involves policymaking or exercise of professional judgment; and (3) the consequences of not applying official immunity." *Southers,* 263 S.W.3d at 610. "Discretionary acts, those that require the exercise of judgment and discretion in determining how or whether an act should be done, are protected. Ministerial acts, which amount to a clerical duty performed pursuant to a mandate with no exercise of judgment involved, are not protected. We look at the degree of reason and judgment required to perform the act when determining whether an act is discretionary or ministerial." *M.C.-B. ex rel. T.B. v. Hazelwood Sch. Dist.,* 417 S.W.3d 261, 265 (Mo. Ct. App. 2013) (internal citations omitted).

"[W]hether Defendants are entitled to official immunity is a question of law" to be decided by the Court. *Letterman v. Does,* 859 F.3d 1120, 1125 (8th Cir. 2017). However, that legal determination depends on factual matters related to the duty that was allegedly breached, particularly the nature of the official's duties, whether the duty requires a public official to take a specific action, and whether the duty calls for the exercise of discretion or judgment. *E.g., M.C.-B.,* 417 S.W.3d at 265. For instance, in *Woods v. Ware,* 471 S.W.3d 385 (Mo. Ct. App. 2015), the Missouri Court of Appeals considered policies and regulations related to the supervision of high school wrestlers. The court examined the policies and regulations and observed that while they required officials to supervise wrestlers during practice, "[n]one of the[ ] policies specifically define what it means to properly supervise or conduct a wrestling practice. Determining how to supervise and conduct the wrestling practice is left to the discretion of the coach. . . . The policies merely dictate that students should be 'properly supervised' and that a coach should 'seek to meet individual needs.' These dictates do not create a ministerial duty . . . ." *Woods,* 471 S.W.3d at

393.  In contrast, in *J.M. v. Lee's Summit Sch. Dist.,* 545 S.W.3d 363 (Mo. Ct. App. 2018), the supervisor of an afterschool program directed that any student playing catcher in a softball game must wear protective equipment, including a facemask.  When a student reported that the facemask did not fit him, another school official told him that he should play catcher without the facemask.  The student was then injured when he was hit in the face with a bat.  *J.M.,* 545 S.W.3d at 367-68.  The Missouri Court of Appeals held that official immunity was not available because the official's duty to instruct catchers to wear facemasks involved no judgment, and thus was ministerial and not discretionary.

In opposing summary judgment, Plaintiff has identified three policies that allegedly contain ministerial obligations that were violated by Defendants.  (*See* Doc. 109, pp. 51-53; Doc. 110, pp. 47-49.)

- P2130, which prohibits harassment and requires officials to "promptly investigate all complaints . . . of unlawful harassment or unlawful discrimination because of . . . sex [and] to promptly take appropriate action to protect individuals from further harassment or discrimination; and, if it determines that unlawful harassment or discrimination occurred, to promptly and appropriately discipline any . . . teacher . . . who is found to have violated this Policy, and/or to take other appropriate action reasonably calculated to end the harassment/discrimination."  (Doc. 119-11.)

- R2130, which describes actions that "may" constitute sexual harassment, (Doc. 119-12, p. 1), and requires that harassment be reported to the Assistant Superintendent.  (Doc. 119-12, p. 3.)

- The 2013-14 Student Handbook, which states that "[a]ny violations of law are reported to local enforcement agencies."  (Doc. 119-13, p. 5.)

P2130 and R2130 are similar, and the Court will discuss them together. The only duty mandated by P2130 is to investigate complaints and take "appropriate" action. Here, the Record establishes that the Individual Defendants investigated all complaints that they received and responded with actions that they deemed appropriate. P2130 does not specify any particular acts to be taken in the course of investigating complaints, nor does it specify the action to be taken after the investigation is completed. Both matters are left to the school officials' discretion, so they are entitled to official immunity. *See, e.g., Hutson v. Walker,* 688 F.3d 477, 485-86 (8th Cir. 2012) (Even when an investigation is required, absent specific steps to be taken "the manner in which those duties must be completed remains highly discretionary."); *Reasonver v. St. Louis County, MO,* 447 F.3d 569, 585-86 (8th Cir. 2006) (claim that police officers conducted negligent investigation barred by official immunity). Similarly, R2130 requires officials to first exercise judgment and discretion to determine whether harassment has occurred based on a list of factors that may (and therefore may not) indicate that harassment occurred. And, as the Court previously observed, "[d]etermining how to deal with complaints about a teacher's misconduct requires the . . . exercise of judgment," which is the hallmark of a discretionary decision. (Doc. 31, p. 17.) Neither of these policies contains any ministerial, non-discretionary duties that were allegedly violated by the Individual Defendants.

Plaintiff relies on the Student Handbook to argue that the Individual Defendants had a ministerial duty to report Feazell for attempted kidnaping. The Court disagrees. The portion cited by Plaintiff does not appear applicable; it is a warning to students that violations of law by *students* will be reported. Relatedly, it does not even mandate that school officials report violations of law. Finally, determining whether a violation of law has occurred requires judgment and discretion. The Eighth Circuit has held that whether to report a person to the authorities (even under

mandatory reporting statutes) is a discretionary act. "[T]o trigger the reporting requirement, there must be 'reasonable cause' to suspect abuse, and that 'reasonable cause' determination requires an exercise of discretion and personal judgment, which takes the matter out of the realm of a ministerial act." *K.B.*, 764 F.3d at 825 (quotations omitted). Similarly, it required an exercise of discretion to determine whether Feazell's request to MM constituted attempted kidnaping that should have been reported to the authorities.

The Court concludes that Plaintiff has failed to identify any ministerial, non-discretionary duties that were violated by the Individual Defendants.[13] Plaintiff's negligence claim is based on breaches of discretionary duties, so the Individual Defendants are entitled to official immunity. Summary judgment is granted to Defendants on Count I.

## B. Count II – Title IX Claim Against the District

The District seeks summary judgment on the Title IX claim, arguing that the Record establishes that appropriate officials did not have actual knowledge of a substantial risk that Plaintiff's rights under Title IX were being violated. Plaintiff contends that there are sufficient facts in the Record to create a factual dispute on this issue. The Court disagrees with Plaintiff's characterization of the Record.

Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C.A. § 1681(a). Under Title IX, a school district can be liable for damages when a teacher sexually harasses a student. *E.g., Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 74-75 (1992). However, the Supreme

---

[13] Plaintiff's Suggestions in Opposition also reference the District's policy regarding teachers texting students. However, Plaintiff does not rely on these policies to support Count I, and there is no indication that these policies established any ministerial duties on the Individual Defendants upon learning that Feazell violated those policies.

Court has held that a theory of *respondeat superior* is insufficient to impose liability on a school district under Title IX. *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 285-90 (1998). "[A] damages remedy will not lie under Title IX unless an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." *Id.* at 290. Decisions from the Eighth Circuit indicate that officials must be aware of sufficient facts to suggest that there is a "substantial risk" that the student's Title IX rights are being violated. *K.T. v. Culver-Stockton Coll.,* 865 F.3d 1054, 1058-59 (8th Cir. 2017); *Doe v. Flaherty,* 623 F.3d 577, 585 (8th Cir. 2010); *see also Thomas v. Board of Trustees of the Nebraska State Colleges,* 667 Fed. App'x 560, 562 (8th Cir. 2016).

There can be little doubt that a report to the superintendent is sufficient to impute knowledge to the District. Indeed, Mayo demonstrated that he had the authority to institute corrective measures. "It is [also] apparent from Supreme Court precedent . . . that school principals are considered 'appropriate persons' in the Title IX analysis." *Plamp v. Mitchell Sch. Dist. No. 17-2,* 565 F.3d 450, 457 (8th Cir. 2009). Therefore, the Court focuses on the information known by Mayo, Curley, and Summers, and in so doing concludes that they did not have actual knowledge of a substantial risk of harm to Plaintiff until October 2014 – at which point the District acted by calling the police and suspending Feazell.

Plaintiff has presented a rendition of the facts that relies significantly on inadmissible evidence and unreasonable, speculative inferences from the facts – much of which has been addressed in Part I of this Order. The Court can rely only on the facts and reasonable inferences that are supported by the Record. In summary, there is no evidence that anyone expressed any concerns about Feazell's relationship with Plaintiff until July 2013. At that time, Plaintiff's mother

provided the two letters to Curley and showed him text messages that Feazell sent to Plaintiff's phone. Neither the letters nor the text messages reflected that a sexual relationship existed; indeed, Plaintiff's mother did not even express this concern.[14] The letters expressed Feazell's love for Plaintiff "as a daughter," and while this may have been inappropriate and unprofessional, it does not suggest a substantial risk that Feazell was engaging in inappropriate physical activity with Plaintiff. Feazell told Curley that she was acting out of concern for Plaintiff's welfare at home, and Curley told her not to text Plaintiff and to talk to her only about school-related matters.

Approximately two months later, Feazell attempted to arrange to "hang out" with Plaintiff and revealed that she was preparing a room for Plaintiff so that Plaintiff could live with her. When confronted, Feazell again explained that she was concerned for Plaintiff's well-being at home. Feazell was placed on probation for four months, again told not to communicate with Plaintiff about non-school matters and was warned that further transgressions would result in further discipline (possibly including termination). No other interactions between Feazell and Plaintiff were brought to Defendants' attention, and no other concerns were raised.

Finally, Feazell's personnel file contained three letters to unidentified students. None of them appear to be appropriate communications; in one of them she proposes traveling to softball games with the student and says that she "might be able to practice my tongue thing on a real person," but no other details about this letter are in the Record. The other two letters, while unprofessional, do not suggest anything sexual. There is no evidence that Defendants knew about Feazell's sexual activities with Plaintiff or the texts Feazell sent to the phone that she secretly purchased for Plaintiff until October 2014.

---

[14] Even if Feazell sent Plaintiff these texts after Curley told her to stop texting Plaintiff, (*see* page 6, n.5), the texts would have only established that Feazell violated Curley's instructions. There is no evidence that the content of these should have alerted Curley to the risk of sexual misconduct by Feazell.

Collectively, these facts construed in Plaintiff's favor do not suggest a substantial risk of sexual harassment or assault. Apart from the letter mentioning Feazell's "tongue thing" there is nothing remotely sexual, and even that letter – with all of its surrounding uncertainty – is insufficient to suggest a substantial risk that Feazell was violating (or going to violate) a student's Title IX rights.

Prior cases support this conclusion. For instance, in *P.H. v. School District of Kansas City, MO,* 265 F.3d 653 (8th Cir. 2001), a teacher was engaged in sexual relations with a student. During that time, the student was absent from school approximately 25% of the time and frequently tardy because he was with the teacher, causing his grades to drop. School officials learned of rumors that the teacher and student were spending a lot of time together, and when confronted the teacher explained that the student was involved in organizations and activities sponsored by the teacher. Officials regarded this as a "logical explanation" but nonetheless advised that he stop spending so much time with the student. *P.H.,* 265 F.3d at 657. The Eighth Circuit affirmed the grant of summary judgment. It explained that while the teacher "was spending an excessive amount of time with P.H., resulting in absences, tardiness, and falling grades [and] [s]uch action on the part of a teacher is certainly cause for concern, . . . it does not automatically give rise to a reasonable inference of sexual abuse. The principal and vice principal confronted the teacher and expressed concern to P.H. and his mother, but allegations of sexual misconduct never surfaced. The school officials' conduct of not discovering the sexual abuse given all of P.H.'s absences and his falling grades at most rises to negligence," but negligence is insufficient. *Id.* at 659.

In *Plamp*, school officials learned in May 2011 that a teacher had been harassing a particular student and called the police. The student filed suit, alleging that the school district should have known before that date that there was a substantial risk that the teacher would harass

students based on three events.  First, in 1995, a man anonymously reported "that his fiancée (who was a former student at Mitchell High School) was having sex-related problems because of her experiences with" the teacher.  *Plamp,* 565 F.3d at 455.  Second, in 2000 a female student complained that she felt "uncomfortable" in the teacher's class but would not (or could not) explain why.  *Id.*  Finally, during the 2004-05 school year another female student reported that she was uncomfortable in the teacher's class because the teacher "was using instances of graphic sexual violence against women to teach various parts of his class" and "appeared to garner pleasure at this." *Id.*  The school district told the teacher that his lessons were making students uncomfortable, and there were no further complaints.  The Eighth Circuit affirmed the trial court's entry of summary judgment on the Title IX claim, holding that "[t]hese vague complaints are insufficient to support a finding that [the school officials] had actual knowledge of [the teacher's] discriminatory actions." *Plamp,* 565 F.34d at 457.  In reaching this conclusion, the Court of Appeals cited *Gebser* for the proposition that a complaint charging that a teacher made inappropriate comments is insufficient to alert officials to the possibility that the teacher is involved in a sexual relationship with a student. *Id.* (citing *Gebser,* 524 U.S. at 291).  The court also cited *P.H.* for the proposition that complaints that a teacher is showing favoritism toward a student but that do not express suspicions or concerns about sexual activity are insufficient.  *Id.* (citing *P.H.,* 265 F.3d at 662-63).

In *Doe v. Flaherty*, parents complained that a teacher had been sending texts to female students.  One such text asked the student "are you drunk yet?"  The superintendent confronted the teacher, who "explained that the message was a continuation of teasing started by students at basketball practice concerning a public intoxication ticket the player had allegedly received." *Doe v. Flaherty,* 623 F.3d at 580.  The teacher agreed that the text was inappropriate and agreed he

would not send such texts in the future. Shortly thereafter, another parent complained about text messages regarding the schedule for basketball practices. The teacher agreed not to text students but "[l]ater, while making room assignments for an out-of-town game, [the teacher] jokingly told the player that her mother could stay with him." *Id.* Around the same time, the principal was told of statements from someone who suggested that the plaintiff in the case "might have a crush" on the teacher and was leaving home economics class to meet with the teacher in the gym. The principal talked to the home economics teacher, learned that the plaintiff had not been noticed leaving class and had been absent only once or twice. While this investigation was taking place, the plaintiff's mother called the principal and related that she had heard that plaintiff was skipping class to see the teacher in the gym and had been seen sitting on his desk while wearing her cheerleading uniform. Subsequently, the teacher was involved in two more texting incidents; in one, he texted a female student "OMG you look good today," and in the other a student directed a message containing "vulgar language" to the teacher but accidentally sent it to a fellow student. Both of these texts were reported to school officials. The Eighth Circuit affirmed the district court's summary judgment ruling, holding that the teacher's communications and the rumors about the teacher did not provide actual notice of sexual abuse. *Id.* at 858-86.

Finally, *Thomas* involved a student who transferred from one college to another, then volunteered to be the strength and conditioning assistant for the women's basketball team. A background check revealed that he had been convicted of only minor traffic offenses. Later, the school received an email claiming that the student he had been convicted of robbery, accused of other robberies, and had been charged with "forcible fondling (RAPE) on a 18yr old female" but the charge was dropped. *Thomas,* 667 Fed. App'x at 561. A second background check was conducted; this time, in addition to the traffic offenses the check uncovered a misdemeanor theft

conviction. The student's previous school was contacted for a reference and that school recommended that the student not be hired as an assistant. The student was not hired and was instructed not to have contact with the women's basketball team. Later, two students complained that they had been harassed by the student. One complaint "involved continuous sexually inappropriate comments and one occasion on which [the student] waited for the [complainant] to finish her work shift and then asked for a kiss once alone with her. *Id.* The other complaint "alleged continuous comments and a deceptive Facebook communication" that made the complainant "feel uncomfortable but not threatened . . . ." *Id.* He was "sanctioned with online education activities and 10 hours of community service, neither of which he completed." *Id.* Approximately three months later, he kidnapped a fellow student, sexually assaulted her, then murdered her. The administrator of the victim's estate filed a Title IX claim against the school; the district court granted summary judgment to the college and the Eighth Circuit affirmed. In so doing, the Court of Appeals cited *Gebser* for the proposition that a single complaint of inappropriate comments is insufficient to create actual knowledge of a sexual relationship. *Id.* (citing *Gebser,* 524 U.S. at 291). The Court of Appeals also held that "knowledge of less severe past misconduct is unlikely to establish knowledge that the party poses a substantial risk of abuse." *Id.*

The facts in this Record are on par with those in the four cases cited above. The facts in this case, construed in Plaintiff's favor, would not permit a jury to find that the District's officials had more knowledge of a substantial risk of harm than the officials in the four cited cases. Plaintiff continuously characterizes the letters Feazell wrote to her as inappropriate and unprofessional for a teacher, and this is a fair interpretation of the Record. However, the District's knowledge that Feazell wrote inappropriate and unprofessional letters to Plaintiff does not provide the District

with knowledge of a substantial risk that Feazell would sexually assault Plaintiff. Based on the facts that could be presented to a jury and the controlling precedent, the Court concludes that the District is entitled to summary judgment on Plaintiff's Title IX claim.

### C. Counts III and IV – Due Process and Equal Protection Claims Against the Individual Defendants

The Court's analysis of Plaintiff's Due Process and Equal Protection claims is similar to its analysis of Plaintiff's Title IX claim. Normally, "a supervisor incurs liability for a violation of a federally protected right when the supervisor is personally involved in the violation or when the supervisor's corrective inaction constitutes deliberate indifference toward the violation." *Ottman v. City of Independence,* 341 F.3d 751, 761 (8th Cir. 2003). However, the deliberate indifference standard is elevated when (1) the claim is asserted against a supervisor at an institution that receives Title IX funding and (2) that claim is based on another person's violation of a student's federally protected right. *Cox v. Sugg,* 484 F.3d 1062, 1066-67 (8th Cir. 2007). In these situations, the Eighth Circuit "has determined that the individual liability of a supervisory school official under § 1983 should be measured by the [higher] standards of the institution's Title IX liability established in *Gebser*" to make sure that school officials are not held liable when the school itself is not. *Doe v. Flaherty,* 623 F.3d at 584. Accordingly, the Court's inquiry for purposes of the Individual Defendants' liability under Counts III and IV is similar to the inquiry conducted for purposes of the District's liability under Count II. *See id.* And, unsurprisingly, the Court's conclusions are the same. Having concluded that Curley's, Summers's, and Mayo's knowledge was insufficient to impose liability on the District, and given that the same degree of knowledge

is necessary for them to be personally liable under § 1983, the Court must grant them summary judgment on Counts III and IV.[15]

## D.  Count V – Section 1983/Monell Claim Against the District

Count V alleges that the District is liable for the constitutional violations of its employees. This claim requires evidence that would (1) establish that the Plaintiff's federal rights were violated and (2) that the additional elements set forth in *Monell v. Department of Social Servs.,* 436 U.S. 658 (1978), have been satisfied.  Those additional elements require that "the violation resulted from (1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Corwin v. City of Independence., MO.*, 829 F.3d 695, 699 (8th Cir. 2016) (quotations and citations omitted).  A policy is an expression of the municipality's deliberate choice to adopt a guiding principle or procedure, *e.g., id.,* and Plaintiff does not allege that the District deliberately adopted an unconstitutional policy.  Instead, as pleaded Count V is predicated on a theory that the District had an unofficial custom of not reporting complaints of harassment or that it inadequately trained its employees how to deal with such complaints. However, the Record does not contain facts that would permit a jury to find for Plaintiff.

A custom is established by demonstrating "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation."  *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014).  For the reasons stated above, Curley, Summers and Mayo did not engage in

---

[15] The Court's analysis makes it unnecessary to parse the knowledge possessed only by some but not all three of the Individual Defendants, or evidence that is admissible as to some but not all of them.

unconstitutional conduct. Feazell did, but the Record is devoid of evidence that the District is deliberately indifferent to a continuing, widespread pattern of sexual assault and molestation by its teachers. And, significantly, Plaintiff does not defend Count V by arguing that she can establish that the District had such a custom.

Instead, Plaintiff's sole argument is that the District had "specific knowledge of the lack and need of training beyond" what had been provided. (Doc. 109, pp. 50-51.) For support, Plaintiff relies on two brief passages from the High School counselor's deposition. In the first, she was asked if she had training about being a mandatory reporter, and she said that she "had minimal training." (Doc. 119-29, p. 2 (Lane Dep., p. 57).) Later, when asked if she ever told the District that she needed more training, she stated "I didn't go to the district and say I needed more training. I talked to our special ed director and said that this is getting serious, that our district needs more training. We had – we had secretaries and bus drivers who did not know that they were mandatory reporting – reporters." (Doc. 119-29, p. 6 (Lane Dep., pp. 161-62).) Thus, in context, the training described by the counselor related to training people who might not known that they were mandatory reporters. This testimony does not establish that the training provided to teachers and administrators (such as Curley, Summers and Mayo) was inadequate. In addition, the counselor admitted that she did not share these concerns with the District – which is critical, because the District cannot be found to have been indifferent to the deficiency if it did not know that it existed. *Atkinson v. City of Mountain View, MO,* 709 F.3d 1201, 1216-17 (8th Cir. 2013). "Notice is the touchstone of deliberate indifference in the context of § 1983 municipal liability." *Atkinson v. City of Mountain View, MO,* 709 F.3d 1201, 1216 (8th Cir. 2013). The counselor did not even testify *when* she made this statement. Finally, there must be evidence that would permit a jury to conclude that the need for more or different training was so obvious that the District's policymakers could

be characterized as being deliberately indifferent. *E.g., Parrish v. Ball,* 594 F.3d 993, 998 (8th Cir. 2010); *Plamp,* 565 F.3d at 461-62; *Thelma D. v. Board of Educ. Of City of St. Louis,* 934 F.2d 929, 934-35 (8th Cir. 1991). And Plaintiff identifies no inadequacies in the District's training that resulted in Feazell's unconstitutional conduct. *See City of Canton v. Harris,* 489 U.S. 378, 391 (1989). For these reasons, the District is entitled to summary judgment on Count V.

### III. CONCLUSION

For the reasons stated above, both motions for summary judgment are granted, and Defendants are granted summary judgment on all claims remaining in this case.

IT IS SO ORDERED.


/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
DATE: August 6, 2019                         UNITED STATES DISTRICT COURT